1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9          FOR THE EASTERN DISTRICT OF CALIFORNIA
10
11  LAWRENCE L. JACKIO,                    No.  2:16-cv-2812 WBS GGH

12              Petitioner,

13      v.                                 <u>FINDINGS AND RECOMMENDATIONS</u>

14  CHRISTIAN PFEIFFER,

15              Respondent.

16

17

18  *Introduction and Summary*

19          Petitioner was convicted, inter alia, of attempted murder on one house resident, and

20  assault with a firearm and causing great bodily injury on another in an armed robbery/burglary

21  gone bad.  He raises several issues, the most difficult of which involve <u>Faretta</u>[1] issues.  For the

22  reasons set forth below, the undersigned recommends that the petition be denied.

23  *Factual Background*

24          The undersigned finds the factual background set forth by the California Third District

25  Court of Appeal ("Court of Appeal") to be an accurate summary of the facts:

26  *////*

27

28  _____
    [1] <u>Faretta v. California</u>, 422 U.S. 806 (1975).

                                    1

# FACTS

We recount the evidence in the light most favorable to the jury's verdicts. For example, even though neither of the victims was able to identify defendant as one of the assailants, we refer to him by name from the outset because there was ample evidence that he was one of the assailants.

Early in the morning on June 16, 2011, defendant and Rashid Deary–Smith entered the garage of a house where Martez Laster and Antonia Branch lived together with their one-year-old son. Between 2:00 and 3:00 a.m., Branch, who had been out that night, approached the residence in her car with her son in the backseat. She opened the garage door with a remote control from her car and drove into the garage. In the garage, Branch closed the garage door with the remote control and went around her car to get her son out of the backseat. Defendant and Deary–Smith approached her, pointed guns at her, and told her to open the door leading into the house. One of the men, probably Deary–Smith, hit Branch in the head with his gun, opening up a wound that required five staples to close.

Laster, who was inside the house, heard the commotion in the garage and grabbed his .40–caliber handgun. He went to the door that connects the garage to the interior of the house, unlocked it, and began to open it. As he was opening the door, he was rushed by defendant and Deary–Smith. Laster took a couple of steps back and was shot in the side, so he returned fire. Defendant and Deary–Smith retreated into the garage.

Both defendant and Deary–Smith had been hit by gunfire from Laster. Deary–Smith was hit in the head and fell to the floor of the garage, and defendant, who was hit in the leg, escaped out the side door of the garage. Meanwhile, Branch got back into her car, put the car in reverse, and backed up through the closed garage door.

A neighbor saw defendant flee. Defendant limped along, leaving a trail of blood and dragging himself to a car. He got into the car and drove away. A subsequent medical examination revealed that defendant was hit twice in the leg, with one of the bullets breaking his femur. Defendant had gunshot residue on his hands and pants. The DNA in the trail of blood from the house to the car matched defendant's DNA profile. Also along the trail of blood between the house and the car, defendant dropped a nine-millimeter handgun.

When law enforcement arrived at the house, Deary–Smith was still on the floor of the garage. He had zip ties in his pocket, and a loaded .45–caliber semiautomatic handgun was on the ground next to his head. No spent .45–caliber casings were found at the house—evidence that Deary–Smith did not fire the gun. Separate DNA samples from the gun matched Deary–Smith's and Branch's DNA profiles.

Later that day, when the owner of the car that defendant had driven away from the house looked into her car, she found blood and

defendant's wallet. The blood was also identified as defendant's through DNA testing.

Two expended casings from a nine-millimeter gun were found, one in the house and one in the garage. They matched the gun left by defendant as he dragged himself to the car after the shootings.

Defendant testified in his own defense. He admitted that he was at the house in question when the gunfire erupted. He claimed, however, that he had taken Deary–Smith there to meet Deary–Smith's cousin. While defendant was waiting in front of the house, he saw someone back out through the garage door, heard gunshots, and realized he had been hit. He dragged himself to the car and drove away.

PROCEDURE

A jury convicted defendant of first degree burglary (Pen. Code, § 459; count one); two counts of assault with a firearm (Pen. Code, § 245, subd. (a)(2); counts two and four); attempted murder (Pen. Code, §§ 664, 187, subd. (a); count three); two counts of attempted first degree robbery (Pen. Code, §§ 664, 211; counts five and six); and being a felon in possession of a firearm (Pen.Code, § 12021, subd. (a)(1); count seven). The jury also found true various arming, discharge, and great bodily injury allegations. In a bifurcated proceeding, the trial court found that defendant had a prior serious felony conviction. The court sentenced defendant to a determinate term of 19 years four months in state prison, with a consecutive indeterminate term of 50 years to life.

People v. Jackio, 236 Cal. App. 4th 445, 447-449 (2015).

*Issues*

Petitioner raises the following three issues:

1. Whether the trial court's advisement as to the "range of penalties," prior to accepting the Faretta waiver and permitting petitioner to represent himself, was adequate;

2. Whether petitioner's desire to represent himself was born from an incompatible relationship with his attorney—presenting petitioner with a "Hobson's Choice" of representing himself or continuing with counsel; and

3. Insufficient Evidence: Petitioner being inside the house (garage area) at the time of the attempted robbery, attempted murder, etc., and a participant in the robbery/burglary/attempted murder, etc. in any event.

*////*

*////*

*AEDPA Standards*

The statutory limitations of the power of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The text of § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), clearly established federal law consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir.2013) (citing Greene v. Fisher, 565 U.S. 34, 39 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)). Circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 63-64 (2013) (citing Parker v. Matthews, 587 U.S. 37, 48 (2012)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id.

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, supra, 529 U.S. at 413; Chia v. Cambra, 360 F.3d

997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, supra, 529 U.S. at 412. See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, supra, 538 U.S. at 75 (it is "not enough that a federal habeas court, 'in its independent review of the legal question,' is left with a 'firm conviction' that the state court was 'erroneous.'" "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, supra, 562 U.S. at 103.

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, supra, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "[Section] 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Harrington, supra, 562 U.S. at 100. Rather, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100. Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a "federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits." Johnson

5

v. Williams, 568 U.S. 289, 293 (2013). When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. Stanley, supra, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

The state court need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at its decision. Early v. Packer, 537 U.S. 3, 8 (2002). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, supra, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Id. at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." Harrington, supra, 562 U.S. at 98. A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Harrington, supra, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" Id. at 101 (quoting Knowles v. Mirzayance, 556 U.S. 111, 122 (2009)). Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state

////

6

court's contrary conclusion was unreasonable." Id. at 102 (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

With these principles in mind the court turns to the merits of the petition.

*Discussion*

A. <u>Faretta Advisement About the "Range of Potential Penalties</u>

A criminal defendant seeking to represent himself must be advised of the pitfalls which he may well encounter in a criminal proceeding along with the possible downside in terms of penalty, i.e., upon conviction the "range" of punishment risks involved in self-representation. <u>Faretta</u>, <u>supra</u>. A failure of the trial court to perform both advisements may result in an involuntary/unknowing waiver of the right to counsel. Because this case takes place in the AEDPA setting, the focus of petitioner's inquiry must be whether the Court of Appeal, the last state court with a reasoned explanation, unreasonably applied established Supreme Court binding precedent. The Court of Appeal divided the analysis into two issues: (1) whether the Supreme Court authority requiring advisement on the "range of penalties" applied in a trial setting as opposed to a guilty plea setting; and (2) whether advisement of the maximum potential penalty without more was adequate advisement. The undersigned finds below that binding Supreme Court precedent does not permit the analysis of the Court of Appeal to apply to the first issue, but that as to the second, advice of "up to life" in prison as the maximum punishment suffices to satisfy the requirement to give the "range" of penalties.

The Court of Appeal found the following on the first issue:

Faretta Waiver

> Before trial, defendant decided to represent himself, which prompted the trial court to warn defendant of the dangers of self-representation, including the possibility that he faced, in the trial court's words, "life in prison." Defendant contends that, when he moved to represent himself, the trial court failed to give him an adequate breakdown of what punishment he was facing if convicted. He argues that, under these circumstances, his waiver of the right to counsel was not knowing and voluntary under <u>Faretta v. California</u> (1975) 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (<u>Faretta</u>).

////

Defendant's contention raises two issues.

First, what notice does the Sixth Amendment require concerning the penalty faced if the defendant is convicted? Does it require a breakdown of the full range of sentencing options with respect to the crimes and enhancements charged? Or does it simply require the court to notify the defendant concerning the maximum penalty he faces? We conclude that it is the latter—that the court need notify the defendant only of the maximum penalty he faces.

And second, did the trial court's waiver colloquy in this case adequately notify this defendant of the maximum penalty he faced if convicted? We conclude that, by informing defendant that he faced life in prison as a penalty for the crimes and enhancements charged, the court adequately notified defendant of the possible penalty he faced if convicted.

Because the trial court's advisement concerning the penalty was adequate, defendant's waiver of the right to counsel was knowing and voluntary, and there was no violation of his Sixth Amendment right to counsel.

A. Procedural Background

On March 23, 2012, defendant signed a <u>Faretta</u> waiver form which included the following statement: "Penalties for offense if found guilty are life in prison." The underscored part of the statement was handwritten. After a preliminary hearing on April 16, 2012, however, defendant requested and was granted appointment of counsel.

On May 18, 2012, defendant appeared before the court on a new <u>Faretta</u> motion. Defendant said that he was a high school graduate and had finished almost a year of college. The court went through the normal litany of admonitions about representing oneself in a criminal action. (Defendant does not claim on appeal that the admonitions were deficient, except as discussed here.) The relevant colloquy is as follows:

"THE COURT: ... You do understand the penalties for the offenses for which you've been charged could carry up to a life sentence[?] [¶] Do you understand that?

"THE DEFENDANT: Yes." (Italics added.)

The court provided another <u>Faretta</u> waiver form, which defendant signed, with the following statement: "Penalties for offense if found guilty are life." Again, the underlined portion was handwritten. The form listed the code sections for the crimes charged in the information, but it did not list any code sections for enhancements.

The court found that defendant had made a knowing and voluntary waiver of his right to counsel.

////

8

## B. Sixth Amendment Jurisprudence

The Sixth Amendment of the United States Constitution guarantees a defendant both (1) the right to be represented by counsel at critical stages of the prosecution and (2) the right to represent himself, if he so elects. (Faretta, supra, 422 U.S. at p. 819, 95 S.Ct. 2525; People v. Koontz (2002) 27 Cal.4th 1041, 1069, 119 Cal.Rptr.2d 859, 46 P.3d 335 (Koontz).) However, we must indulge every reasonable inference against a defendant's waiver of the right to counsel. (Brewer v. Williams (1977) 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 424; Koontz, supra, 27 Cal.4th at p. 1069, 119 Cal.Rptr.2d 859, 46 P.3d 335.)

A valid waiver includes: (1) a determination by the court that the defendant has the mental capacity to understand the proceedings (which is not an issue in this case) and (2) a finding that the waiver is knowing and voluntary, which entails a finding that the defendant understands the consequences of the decision and is not being coerced. (Godinez v. Moran (1993) 509 U.S. 389, 400–401 & fn. 12, 113 S.Ct. 2680, 2687–2688 & fn. 12, 125 L.Ed.2d 321, 332–333; Koontz, supra, 27 Cal.4th at pp. 1069–1070, 119 Cal.Rptr.2d 859, 46 P.3d 335.)

"In order to make a valid waiver of the right to counsel, a defendant 'should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." [Citation.]' (Faretta, supra, 422 U.S. at p. 835 [95 S.Ct. 2525].) No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation; the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case. [Citation.]" (Koontz, supra, 27 Cal.4th at pp. 1070, 119 Cal.Rptr.2d 859, 46 P.3d 335.)

Our role on appeal after a defendant has defended himself under Faretta and now claims that his waiver of the right to counsel was made without being adequately advised of the dangers and disadvantages of self-representation is to examine the whole record to determine de novo whether the waiver was valid. (Koontz, supra, 27 Cal.4th at pp. 1070, 119 Cal.Rptr.2d 859, 46 P.3d 335.)

## C. Analysis

### 1. What does the Sixth Amendment require?

As noted, defendant was warned that he could be sentenced up to life in prison if convicted. On appeal, he claims, however, that the advisement was inadequate because the trial court was required to advise him of the full range of punishments he could face for the crimes and enhancements charged.

Defendant relies primarily on a decision of the Ninth Circuit of the United States Court of Appeals in making his contention that the advisements here were inadequate. But we are not bound by that

decision. (<u>People v. Crittenden</u> (1994) 9 Cal.4th 83, 120, fn. 3, 36 Cal.Rptr.2d 474, 885 P.2d 887.) Therefore, although we will discuss the Ninth Circuit decision later, we start with the jurisprudence of the California Supreme Court and the United States Supreme Court.

No case of the California Supreme Court directly answers the specific question posed in this case: whether a defendant wishing to represent himself at trial must be advised of the full range of punishments he could face if convicted. However, in 2002, the court held that a trial court did not err in giving advisements when it instructed a defendant who wanted to represent himself at trial that he faced the death penalty. (<u>Koontz</u>, <u>supra</u>, 27 Cal.4th at pp. 1069–1073, 119 Cal.Rptr.2d 859, 46 P.3d 335.

Obviously, the sentence could have been life without parole, even if he was convicted of all the crimes, because the death penalty is not mandatory for any crime in California. (See Pen.Code, § 190.) But in <u>Koontz</u>, the court did not discuss specifically the advisement concerning the possible penalty if the defendant was convicted. Instead, it rejected the defendant's contentions that (1) the trial court did not adequately warn him of the disadvantages of not having an attorney represent him and (2) the defendant was mentally unfit to comprehend the risks of representing himself. (<u>Koontz</u>, <u>supra</u>, 27 Cal.4th at pp. 1072–1073, 119 Cal.Rptr.2d 859, 46 P.3d 335.) A case is not authority for a proposition not considered. (<u>Ginns v. Savage</u> (1964) 61 Cal.2d 520, 524, fn. 2, 39 Cal.Rptr. 377, 393 P.2d 689.)

A 2009 California Supreme Court case summarized the law generally applicable in these circumstances:

" 'A defendant seeking to represent himself "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation]." (<u>Faretta</u>, <u>supra</u>, 422 U.S. at p. 835, 95 S.Ct. 2525.) "No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation." [Citation.] Rather, "the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." [Citations.]' [Citation.] Thus, '[a]s long as the record as a whole shows that the defendant understood the dangers of self-representation, no particular form of warning is required.' [Citations.]" (<u>People v. Burgener</u> (2009) 46 Cal.4th 231, 240–241, 92 Cal.Rptr.3d 883, 206 P.3d 420 (<u>Burgener</u>).)

Likewise, no decision of the United States Supreme Court answers the specific question presented by defendant here. However, in 2004, the high court provided guidance concerning the necessary advisements in a different procedural setting—when a defendant desires to represent himself to enter a guilty plea. (<u>Iowa v. Tovar</u> (2004) 541 U.S. 77, 124 S.Ct. 1379, [158 L.Ed.2d 209] (<u>Tovar</u>).)

In <u>Tovar</u>, the defendant said during pretrial proceedings that he wanted to represent himself and to plead guilty. The trial court engaged in a guilty plea colloquy, advising the defendant of the rights he must waive to plead guilty, but the court did not advise the defendant under <u>Faretta</u> of the dangers and disadvantages of self-representation. The Iowa Supreme Court found that the trial court's advisements were deficient because the court did not warn the defendant that by representing himself he might overlook viable defenses and would not have the opportunity to obtain an independent opinion of whether he should plead guilty. (<u>Tovar</u>, <u>supra</u>, 541 U.S. at pp. 81–84, 124 S.Ct. 1379.)

On review, the <u>Tovar</u> court held that the advisements required by the Iowa Supreme Court are not required by the United States Constitution. Instead, "[t]he constitutional requirement is satisfied when the trial court informs the accused of the nature of the charges against him, of his right to be counseled regarding his plea, and of the range of allowable punishments attendant upon the entry of a guilty plea." (<u>Tovar</u>, <u>supra</u>, 541 U.S. at p. 81, 124 S.Ct. 1379, italics added.)

The <u>Tovar</u> court emphasized that the central component for a valid waiver is that the defendant knows what he is doing because he has been warned of the hazards ahead. But there is no prescribed script. (<u>Tovar</u>, <u>supra</u>, 541 U.S. at pp. 88–89, 124 S.Ct. 1379.)

The difference in procedural settings of this case and <u>Tovar</u> is significant. In <u>Tovar</u>, the defendant was pleading guilty. Here, a trial lay ahead.

<u>Tovar</u>'s requirement that a defendant desiring to represent himself in order to enter a guilty plea be advised of "the range of allowable punishments attendant upon the entry of a guilty plea" cannot practically be applied to a defendant desiring to represent himself at trial. The essential difference is that, while in a guilty plea setting the crimes and enhancements for which the defendant can be punished are known, in a case such as ours where the defendant is going to trial the jury may or may not convict the defendant of the crimes or find true the enhancement allegations. This makes it impractical to try to predict the possible terms and enhancements that will eventually be available to the trial court at sentencing.

When a defendant represents himself, he may be acquitted, which means he will not be subject to punishment. On the other hand, he may be convicted of all the crimes charged, with true findings on all the enhancements. In that case, the court may impose the maximum punishment for the crimes and enhancements charged. Also, the jury may convict on some counts and acquit on others or convict of lesser included crimes, and the jury may do the same with the enhancement allegations. If the defendant is convicted and enhancements are found true, the court may strike or stay some of the punishment or select lower terms. In other words, a requirement that a trial court advise a defendant desiring to represent himself at trial of the full range of possible punishments would require the trial court to start with no punishment for acquittal and work its

way through the virtually endless permutations and combinations of terms, ending with the maximum possible punishment. Merely to state it demonstrates the unworkability of requiring the court to advise the defendant as to every possible punishment.

Instead, the most reasonable solution consistent with case law and the United States Constitution is to require the trial court to advise a defendant desiring to represent himself at trial of the maximum punishment that could be imposed if the defendant is found guilty of the crimes, with enhancements, alleged at the time the defendant moves to represent himself. By so advising, the trial court puts the defendant on notice that, by representing himself, he is risking imposition of that maximum possible punishment. The defendant who decides to represent himself after this advisement proceeds with his " 'eyes open' " and understands the dangers of self-representation, at least with respect to the possible punishment. (*Faretta, supra*, 422 U.S. at p. 835, 95 S.Ct. 2525; *Burgener, supra*, 46 Cal.4th at p. 241, 92 Cal.Rptr.3d 883, 206 P.3d 420.) Neither the Constitution nor interpretive case law requires more.

People v. Jackio, 236 Cal. App. 4th at 451-455.

The Court of Appeal continued:

2. Was the advisement in this case adequate?

With this understanding, that an advisement of the maximum possible punishment satisfies the federal Constitution's requirements with respect to a <u>Faretta</u> colloquy, we turn to the advisement given in this case. Defendant contends that it was deficient because the trial court's statement that he faced life in prison was ambiguous. We disagree.

On appeal, defendant argues: "The court's advisement that [defendant] faced ... 'life' is too ambiguous in light of the various meanings of life, as well as the fact that [defendant] was in fact facing onerous 25–to–life sentences, along with doubled sentences under the Three Strikes statutes."

The focus of our review of the adequacy of a specific <u>Faretta</u> advisement is what the defendant understood from the advisement. (See <u>People v. Welch</u> (1999) 20 Cal.4th 701, 733, 85 Cal.Rptr.2d 203, 976 P.2d 754.) We conclude that the advisement here successfully apprised defendant that, if he were convicted, he could spend the rest of his life in prison.

Three statements are at issue here. The first <u>Faretta</u> waiver form instructed defendant that "[p]enalties for offense if found guilty are life in prison." (Underscoring omitted.) Later, during the second <u>Faretta</u> proceedings, defendant expressly stated that he understood he could be sentenced "up to a life sentence." And finally, the second <u>Faretta</u> waiver form instructed defendant that "[p]enalties for offense if found guilty are life." (Underscoring omitted.)

These statements, taken together, were clear that defendant's punishment could amount to "life in prison," meaning incarceration for the rest of his life. Nothing in the record leads us to conclude otherwise.

However, defendant asserts that, because a "life" term under California law can mean so many different things, we must conclude that the advisement was ambiguous and did not successfully convey to defendant that a conviction might result in incarceration for the rest of his life.

Defendant seeks to equate the court's use of the word "life" with the statutory indeterminate term of life with parole, which allows for parole after seven years. Penal Code section 3046 provides that a prisoner "under a life sentence" may be paroled after seven years. But defendant gives no good reason for us to believe that he reasonably understood the court's advisement to refer to Penal Code section 3046. The advisement did not refer to that code section but instead made a very simple statement about the length of time defendant could be incarcerated.

We also see no relevance of the fact that defendant was facing possible determinate and indeterminate terms or that he could be subject to consecutive terms of 25 years to life for the firearm discharge allegations. Defendant argues that the trial court was required to provide these details, but the United States Constitution does not require an advisement concerning these permutations and combinations, as we already discussed.

Finally, we consider defendant's primary cited authority—United States v. Erskine (9th Cir.2004) 355 F.3d 1161 (Erskine). That Ninth Circuit decision is different on its facts and distinguishable on the law, in addition to not being binding on us. In Erskine, the trial court mistakenly informed the defendant during a Faretta colloquy that he faced a possible one-year incarceration, even though it was possible that the punishment for his crimes would be five years. (Id. at p. 1165.) The Ninth Circuit held that it could not conclude that the defendant's Faretta waiver was knowing and voluntary because of this error in the Faretta colloquy. (Erskine, supra, 355 F.3d at p. 1171.) Here, on the other hand, there was no error in the Faretta colloquy; therefore, the holding of Erskine does not support reversal in this case.

We conclude that the Faretta colloquy in this case did not violate defendant's Sixth Amendment right to counsel.

People v. Jackio, 236 Cal. App. 4th at 455-456.

As the Court of Appeal found, petitioner's cited case of Erskine v. United States is quite distinguishable from the present case. It is one thing during a Faretta advisement to not address, or incorrectly address, a defendant's maximum penalty exposure, and quite another not to address a minimum exposure. Erskine, aside from not being an AEDPA case, does not help petitioner

even if the merits were addressed without AEDPA deference. Moreover, petitioner's case which he requested this court to apply, <u>Najero-Gordillo v. United States</u>, No. CIV 09-397WBS, 2009 WL 2730879 (E.D. Cal. Aug. 25, 2009), also is not apposite. *Federal* habeas cases brought pursuant to 28 U.S.C. section 2255, by definition do not apply the AEDPA deference required by section 2254, and the district judge was not attempting to expound upon clearly established law as set forth by the United States Supreme Court. But more importantly, like <u>Erskine</u>, the <u>Najero-Gordillo</u> case involved an understatement on the maximum penalty. Petitioner's cases do not involve an understatement of the maximum penalty. Rather petitioner contends that the minimum penalty (ies) was not addressed so as to not set forth the "range" of penalties.

Respondent cites to <u>Arrendondo v. Neven</u>, 763 F.3d 1122 (9th Cir. 2014), which is the controlling case here, but it is a closer case than set forth by respondent. This case involved an application of <u>Iowa v. Tovar</u>, 541 U.S. 77 (2004) *in the trial context*. Initially setting forth the general principle that a <u>Faretta</u> advisement did not require any formulaic advisement, <u>Arrendondo</u>, 763 F.3d at 1130, the court went on to hold that:

> <u>Faretta</u> itself did not specifically address the defendant's awareness of his possible punishments. But <u>Tovar</u>, 541 U.S. 77, 124 S.Ct. 1379, did. That case explained that a defendant, before waiving his right to counsel for the purpose of entering a guilty plea, must be aware "of the nature of the charges against him, of his right to be counseled regarding his case, and of the range of allowable punishments attendant upon the entry of a guilty plea." <u>Id.</u> at 81, 124 S.Ct. 1379 (emphasis added); <u>see also</u> <u>Von Moltke v. Gillies</u>, 332 U.S. 708, 724, 68 S.Ct. 316, 92 L.Ed. 309 (1948) (plurality opinion) (stating that a valid waiver of counsel for the purpose of entering a guilty plea requires "an apprehension of ... the range of allowable punishments," among other matters). [footnote 2 omitted]
>
> The requirement recounted in <u>Tovar</u> complements the requisites for a valid waiver of the right to counsel described in Faretta.3 [footnote 3 omitted] As the common law of torts long ago recognized, the rational calculation of risk requires multiplying the magnitude of a threatened loss by the probability of its occurrence. <u>See</u> <u>United States v. Carroll Towing Co.</u>, 159 F.2d 169, 173 (2d Cir. 1947). <u>Tovar</u> supplies the first of these terms; <u>Faretta</u>, the second. By requiring awareness of the range of possible penalties, <u>Tovar</u> ensures that defendants understand the magnitude of the loss they face. <u>Faretta</u>, meanwhile, emphasizes awareness of "the dangers and disadvantages of self-representation"—that is, the specific, tactical liabilities of going to trial without trained counsel. <u>Faretta</u>, 422 U.S. at 835, 95 S.Ct. 2525 (emphasis added). That

14

knowledge relates to the probability that a defendant will be convicted, not the consequences of conviction. In short, the requirements of <u>Faretta</u> and <u>Tovar</u> enrich one another. Taken together, they outline the minimum necessary knowledge for a defendant to calculate knowingly and intelligently the risk of proceeding to trial pro se.

<u>Arrendondo</u> 763 F.3d at 1131.

The Ninth Circuit went on to hold:

<u>Tovar's</u> statement concerning the defendant's knowledge of possible punishments is clearly established Supreme Court law, and was at the time of the Court's decision on the merits.

***

<u>Tovar</u>, unlike this case, concerned an uncounseled guilty plea, not a defendant who represented himself at trial. But <u>Tovar</u> addressed the relationship between waiver at the plea phase and waiver at trial, stating that at the plea stage, "a less searching or formal colloquy" is needed to gauge the defendant's knowledge than is necessary with regard to waiver of trial counsel. <u>Tovar</u>, 541 U.S. at 89, 124 S.Ct. 1379 (emphasis added) (citing <u>Patterson</u>, 487 U.S. at 299, 108 S.Ct. 2389). This difference is "not because pretrial proceedings are 'less important' than trial, but because, at that stage, 'the full dangers and disadvantages of self-representation ... are less substantial and more obvious to an accused than they are at trial.' " <u>Tovar</u>, 541 U.S. at 90, 124 S.Ct. 1379 (emphasis added) (quoting <u>Patterson</u>, 487 U.S. at 299, 108 S.Ct. 2389).

The risk calculation involved in determining whether to represent oneself at trial differs from that at the plea stage with regard to the number of tactical dangers of proceeding without counsel—that is, the probability that proceeding without counsel will affect the outcome. But there is no difference at all in the two circumstances with regard to the other component of risk calculation—namely, knowledge of the magnitude of the risk faced. *And, given the Court's express declaration that the requirements for a guilty plea waiver of counsel are less rigorous than those applicable to a trial waiver, excising any of Tovar's requirements in the trial context would be an unreasonable interpretation of clearly established Supreme Court law.*

<u>Arrendondo</u>, 763 F.3d at 1132 (emphasis added)

Firstly, <u>Arrendondo</u> is an AEDPA case in which the Ninth Circuit expressly held that it was applying established Supreme Court precedent. <u>Id.</u> at 1132. The undersigned recognizes that he is not bound by Ninth Circuit authority in an AEDPA case when the issue decided is simply based on Circuit precedent, or when the Circuit case is an extension or refinement of Supreme

15

Court authority.  <u>See</u> AEDPA standards set forth above.  But it is quite another situation when the Circuit case expressly holds that it is applying established Supreme Court authority.  In the latter situation, the undersigned is bound by the Circuit case.  <u>See</u> <u>Pierce v. Sherman</u>, No. 15-CV-05568 LHK (PR), 2017 WL 600099, at *7 (N.D. Cal. Feb. 13, 2017).   Thus, the Court of Appeal's attempted distinction of <u>Tovar</u> in this case, i.e., <u>Tovar</u> only applies to guilty plea situations, but not during trial, is AEDPA error.  <u>Pierce</u>, <u>supra</u> at *6 (citing <u>Arrendondo</u> 763 F.3d at 1132).

Because the state Court of Appeal committed AEDPA error, the usual deference accorded to state court decisions does not apply here.  But such does not end the issue here.

> *[T]he trial court informed Arrendondo of the maximum penalties carried by conviction for the charged offenses*, possession of a stolen vehicle and possession of stolen property, and Arrendondo confirmed that he understood the court's statement.  <u>See</u> Nev.Rev.Stat. §§ 205.273(4), 205.275(2)(c).  We generally presume that defendants seeking to waive their right to counsel understand what they are told regarding that choice.  <u>See</u>, e.g., <u>Patterson</u>, 487 U.S. at 296, 108 S.Ct. 2389; <u>United States v. Mohawk</u>, 20 F.3d 1480, 1484 (9th Cir.1994).  *In holding valid Arrendondo's waiver of counsel, the Nevada Supreme Court noted, correctly, that Arrendondo's understanding of his potential penal exposure accurately reflected the charging documents before the trial court at the time of his waiver.*

<u>Arrendondo</u>, 763 F.3d at 1133 (emphasis added).

Although petitioner's logical belief that a range of penalties is one that has a beginning and end point on the spectrum of penalties, <u>Arrendondo</u> finds that the range of penalties is sufficiently given if the outer end of the high spectrum is advised.  And it may well be true in a practical sense that a defendant will be most concerned with a maximum penalty and not the varying potential for lesser penalties when deciding whether it is "worth it" to forego counsel.  An advisement of "up to life imprisonment" certainly conveys the idea that there is a possibility of punishment less than life, i.e. a range of punishments.

Moreover, petitioner had been advised throughout the prosecution that lesser than life punishments were available:

THE COURT: What's he looking at?

\*\*\*

THE COURT:  What's the exposure in this case?  Is it significant?

16

MR. WISE:  Yeah.

I mean his offer was 49 years at the intake level.  And I think it's 53 years now and he's looking at life I mean.

ECF No. 24 at 44.

He was also told of the *"potential"* for life in prison.  Id. at 45.  "Potential" certainly connotes that a lesser punishment was possible.  Thus, it cannot be found here that an advisement of "up to life imprisonment," but a failure to give e.g., a specific "25 years-life" range, constitutionally impacted petitioner's decision to forego counsel and represent himself.  "Up to life imprisonment" or "potential for life" adequately conveys the range of penalties for all of petitioner's crimes.  Moreover, petitioner was well aware that his "minimums" were fairly close in range to his "maximums."  This claim should be denied.

      B.  <u>Petitioner was given a "Hobson's Choice" When the Trial Court Denied his Oral Motion to Substitute Counsel Which "Compelled" Him to Represent Himself</u>

During his second request to represent himself, petitioner made an oral "<u>Marsden</u>" motion to obtain new counsel in lieu of representing himself.

MR. WISE: "Your Honor, I would be willing—like if my <u>Marsden</u> motion would be granted and I get another attorney appointed me there (sic), I would be willing to have an attorney.

But—

THE COURT: Doesn't work that way.

THE DEFENDANT: Okay.

Right.

THE COURT: No.

THE DEFENDANT: I get it.

Sorry.

ECF No. 24 at 49.[2]

Petitioner now asserts that he was incorrectly given the "Hobson Choice" of representing

---

[2] The transcript indicates that the attorney (Mr. Wise) initiated the comment about the <u>Marsden</u> motion, but given the context, it is clearly petitioner who is speaking.

himself or being "stuck" with his present counsel." Therefore, he argues, his <u>Faretta</u> waiver was not voluntary. Petitioner raised this issue, not on direct review, but for the first time in a later filed state habeas petition. The California Supreme Court issued two citations in denying the state habeas petition: <u>In re Waltreus</u>, 62 Cal. 2d 218, 225 (1965) and <u>In re Dixon</u>, 41 Cal. 2d 756, 759 (1953). <u>Waltreus</u> stands for the proposition that one cannot seek state habeas review of issues which were addressed already on direct appeal, and <u>Dixon</u>, just the opposite—one cannot seek habeas review of issues which should have been raised on direct review.

<u>Waltreus</u> does not affect federal adjudication of the issue for exhausting "too much" is not a valid procedural default. <u>Hill v. Roe,</u> 321 F.3d 787, 789 (9th Cir. 2003). Petitioner raised several issues on direct review which he repeated in state habeas, e.g, the punishment issue addressed above. Clearly, the <u>Waltreus</u> procedural bar (default) applies to those issues.

However, the <u>Dixon</u> bar is another matter. Clearly, this case citation applied to the present issue in that petitioner should have raised this issue on direct review but he did not. <u>See</u> ECF 12 at 39-61 (Exhibit A). After decades of implicit disapproval of this bar (procedural default) by the Ninth Circuit, the Supreme Court declared that the bar was regularly followed and consistently applied. <u>Johnson v. Lee</u>, 136 S.Ct. 1802, 1805-06 (2016).

The undersigned now looks to cause and prejudice to excuse the procedural default. In essence, petitioner provides none. He does argue that: Petitioners [involuntary] claim is not procedurally default (sic) since it is based substantially on facts and evidence that was not in the record on direct appeal." ECF No. 17 at 8. But that begs the issue here—why did not petitioner appeal on this ground and support it with record citations. Petitioner cannot simply claim that his appellate counsel was ineffective. <u>See</u> <u>Davila v. Davis</u>, __U.S.__, 137 S.Ct. 2058 (2017) (limiting <u>Martinez v. Ryan</u>, 566 U.S.1 (2012), to claims of trial counsel's ineffectiveness to overcome a procedural default.)

The claim is clearly defaulted and it need not be addressed on the merits.

C. <u>Sufficiency of the Evidence</u>

In the petition and the traverse, petitioner expressly contests the sufficiency of the evidence for his convictions. He claims he happened to be at the scene of the crime outside the

victims' house, but that the evidence is insufficient in every way to prove that he participated in the robbery/attempted murder, etc., i.e., he was an unlucky bystander. This claim factually reprises his overarching claimed defense at trial. In that petitioner vaguely weaves various sub-themes under the overarching issue set forth above, respondent addresses other specific or subsidiary sufficiency of the evidence issues which were raised on direct review, and claims that the overarching issue is not exhausted. Although such subsidiary issues are not fairly set forth in the petition, the undersigned will address them as the evidence for the overarching issue is the same as for the subsidiary issues. The asserted lack of exhaustion on the overarching issue need not deter the undersigned here as that claim is clearly unmeritorious on its merits. <u>See</u> 28 U.S.C. section 2254 (b)(2).

Petitioner makes the mistake of concluding all of the circumstantial evidence that pointed to his guilt was "speculative" in that no eyewitness directly implicated him in the crime. He theorizes (without evidence) other possible inferences from the circumstantial evidence. Thus, for example, if he was shot, it was because he caught a bullet in the street that must have come through the house. Petitioner, without any evidence actually pointing to his innocence, fails to see the strong, overwhelming inferences that point to his guilt.

Petitioner does not contest the fact *per se* of the attempted robbery and murder, he just contests his participation at all. As pointed out above in the Court of Appeal published decision, both assailants were hit with gunfire from the homeowner who fired into the garage area. The overwhelming inference to be drawn is that petitioner was in the proximate area of his soon-to-be-deceased co-assailant, i.e., in the garage. The inference petitioner would have drawn, that the homeowner fired into the garage killing his co-assailant and then wildly through the house walls and into the street hitting the "innocent" petitioner is speculation without any corroborating evidence. Petitioner's inference is inconsistent with the blood trail evidence left from the house to petitioner's borrowed car. A neighbor identified petitioner limping down the street (from his gunshot wound), and driving away in his car. The correct inference is that petitioner was fleeing the scene. The bullet which hit the homeowner was traced to a 9-millimeter ("9mm"), which the vanished, "unknown" assailant (according to petitioner) dropped in an area proximate to

petitioner's DNA proven blood trail on the way to a petitioner's borrowed car.  Forensic analysis proved that the bullet which hit the homeowner, had to have been fired from inside the garage area just inside the house because bullet casings from 9mm weapon were found in the garage and the house proper; and these casings came from the discarded 9mm weapon.  Petitioner had gunshot residue found on his person (hands and pants) after arrest—the most logical inference is that this residue was left on petitioner as he fired the weapon, not petitioner's inference that residue was deposited all over petitioner from a stray bullet which had gone some distance through house/garage walls or some highly fortuitous route outside the then closed garage at the time of the shooting.  Petitioner's blood and wallet were found in the car which he had used to flee the scene.  And, of course, if petitioner's story were to be believed, one of the co-assailants had vanished into thin air.  Petitioner's asserted defense that he had dropped off two people at the victims' home at night and was simply waiting outside (for something) does not pass the straight face test much less his burden to show AEDPA unreasonableness.

The standards governing petitioner's insufficient evidence argument are as follows. "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  Sufficient evidence supports a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "After AEDPA, we apply the standards of Jackson with an additional layer of deference." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). See also the AEDPA standards set forth above.  Moreover, petitioner's challenge to the sufficiency of evidence based on credibility of the witnesses is not cognizable in an insufficient evidence claim. See McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir.1994); see also Schlup v. Delo, 513 U.S. 298, 330 (1995) (recognizing that the credibility of witnesses is generally beyond the scope of sufficiency of the evidence review).

Therefore, when a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in

the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt.  Jackson, supra, 513 U.S. at 319.  In Jackson the Supreme Court articulated a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence. United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc).

> First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution.  Jackson, 443 U.S. at 319, 99 S.Ct. 2781 [...] [W]hen "faced with a record of historical facts that supports conflicting inferences" a reviewing court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326, 99 S.Ct. 2781; see also McDaniel [v. Brown], 130 S.Ct. [120,] 673–74 [(2010)].

> Second, after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow "any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319, 99 S.Ct. 2781.

> ***

> At this second step, we must reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt.

Nevils, 598 F.3d at 1165.

And, where the trier of fact could draw conflicting inferences from the facts presented, one favoring guilt and the other not, the reviewing court will assign the one which favors conviction. McMillan, 19 F.3d at 469.[3]

Finally, the above analysis is filtered through the prism of AEDPA unreasonableness, i.e., the conclusions about sufficient evidence drawn from by an appellate court could not reasonably have been found given the evidence because fairminded jurists could not have reached the

---

[3] Of course, the mere fact that an inference can be assigned in favor of the government's case does not mean that the evidence on a disputed crime element is sufficient—the inference, along with other evidence, must demonstrate that a reasonable jury could find the element beyond a reasonable doubt, i.e., "'[a] reasonable inference is one that is supported by a chain of logic, rather than mere speculation dressed up in the guise of evidence.'" United States v. Katakis, 800 F.3d 1017, 1024 (9th Cir. 2015).

conclusions.  Juan H. v. Allen supra.  The foregoing authorities make it impossible for petitioner to meet his burden in this habeas petition given the above facts.

On direct review, petitioner raised other subsidiary sufficiency issues.  Even if the undersigned believed the petition to have raised the specific subsidiary sufficiency issues, the Court of Appeal opinion is clearly AEDPA reasonable:

## II. Sufficiency of Evidence of Gun Discharge and Personal Infliction of Injury

The jury found that, in connection with his attempted robbery of Branch (count five), defendant personally and intentionally discharged a weapon (Pen. Code,§ 12022.53, subd. (c)) and personally and intentionally discharged a weapon causing great bodily injury (Pen. Code, § 12022.53, subd. (d)).  Defendant contends that the evidence was insufficient to sustain these enhancements because there was no evidence that he shot at Branch or that her injuries constituted great bodily injury.  The contention is without merit because it is based on a false premise - that is, that the true findings on these enhancements required that defendant shot at Branch and inflicted on her great bodily injury. To the contrary, defendant's shooting at Laster and inflicting great bodily injury on him was sufficient because defendant did so in the course of his attempted robbery of Branch. (People v. Frausto (2009) 180 Cal.App.4th 890, 897-903 (Frausto).) In his reply brief, defendant invites us to disagree with the 2009 holding in Frausto.  We decline.

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]" ' [Citations.]" (People v. Smith (2005) 37 Cal.4th 733, 738-739.)  We must accept any reasonable inference the jury might have drawn from the evidence.  (People v. Rodriguez (1999) 20 Cal.4th 1, 11.)

In Frausto, the court held that, where a defendant was convicted of one count of murder and two counts of attempted murder, the death of one victim supported imposition of the Penal Code section 12022.53 enhancement with respect to the attempted murder of the other two victims because "[a] reasonable trier of fact could find that the shootings were part of one continuous transaction." (Frausto, supra, 180 Cal.App.4th at p. 903.) The court relied on People v. Oates (2004) 32 Cal.4th 1048, 1052-1056, which held that a single injury supports multiple Penal Code section 12022.53, subdivision (d) enhancements because the enhancement applies to the great bodily injury or death of "any person" and is not limited to the harm done to a particular victim.

Here, defendant's crimes were part of one continuous transaction. Therefore, his shooting of Laster, with resulting great bodily injury, sufficed to sustain the enhancements for discharging a firearm and inflicting great bodily injury as to the attempted robbery of Branch.

III.  Sufficiency of Evidence of Assault and Attempted Robbery

Defendant contends that, because there was no aiding and abetting instruction and there was no evidence that he personally assaulted Branch, the evidence was insufficient to sustain the jury's verdict that he assaulted Branch with a firearm (count two) and intended to rob her (count five).  To the contrary, there was evidence that he personally assaulted Branch with a firearm and intended to rob her.

A.  Assault with a Firearm

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Pen. Code, § 240.) "'Assault with a deadly weapon can be committed by pointing a gun at another person [citation], but it is not necessary to actually point the gun directly at the other person to commit the crime." (People v. Raviart (2001) 93 Cal.App.4th 258, 263.)

After Branch got out of her car in the garage, two men with guns approached her.  She testified that she saw them "pull weapons to [her] head." One of the men told her to open the door, then he hit her in the head with his gun.  Branch also testified that the one who pistol-whipped her was the one who got away, not the one who was shot and remained in the garage, although she said that it was "very possible" that she was wrong about that.

Despite this evidence, defendant asserts that the evidence was insufficient because Branch could not identify him as one of the assailants and her DNA was found on the gun that lay next to Deary-Smith on the floor of the garage after defendant had fled. This argument merely highlights conflicting testimony.   The evidence, as a whole, established that defendant and Deary-Smith were the two men in the garage.  And Branch's testimony that the men pointed their guns at her head was sufficient to sustain the conviction for assault with a firearm.

B.  Intent to Rob

Intent to take personal property in possession of another is an element of attempted robbery.  (Pen. Code, §§ 211, 664.) This intent need not be directly proved but may be inferred from all of the circumstances of the case. (People v. Gilbert (1963) 214 Cal.App.2d 566, 567.)

Defendant argues: "In the instant case, there are only unsupported speculative assumptions that the perpetrator's intent in this count was to rob Branch, who was never asked to turn over any property. There were no demands for money or property, and no facts suggested that the perpetrator's intent was to do anything but get her unexpected presence resolved, so they could go forward with the

23

apparent intent to enter the residence."

The evidence was sufficient that defendant intended to take personal property from Branch, as she was in her own residence during the time of the crimes. A person's personal property in the residence may be in that person's immediate possession even if the property is in a different room because the person exercises some physical control over the property. (*People v. Gomez* (2008) 43 Cal.4th 249, 257.) Here, the jury could have reasonably inferred that defendant and Deary-Smith were trying to get into the house to commit theft. Indeed, there seems to be no other motive for the attempt to get into the house. Also, zip ties were found in Deary-Smith's pocket, indicating an intent to subdue the residents while defendant and Deary-Smith committed the theft. Under this

factual scenario, it was unnecessary for defendant to attempt to take anything that Branch was carrying with her. The evidence that he intended to rob Branch was sufficient.

### IV. Sufficiency of Proximate Cause Evidence

Defendant contends that the evidence was insufficient to sustain the Penal Code section 12022.53, subdivision (d) enhancements on the attempted murder (count three) and attempted robbery (count six) of Laster because the causation requirement was not met. This contention is frivolous.

Penal Code section 12022.53, subdivision (d) provides for a sentencing enhancement of 25 years to life if the defendant "personally and intentionally discharges a firearm and proximately causes great bodily injury ... to any person other than an accomplice…."

Defendant claims that the jury could not rationally conclude that he was the one who shot Laster. To the contrary, the evidence showed that: (1) defendant had a nine-millimeter handgun, while Deary-Smith had a .45-caliber handgun, (2) two nine-millimeter casings were found at the scene, while no .45-caliber casings were found, (3) defendant had gunshot residue on his hands, and (4) Laster was shot by one of the assailants. Under this factual scenario, the jury easily inferred that defendant shot Laster.

Defendant cites <u>People v. Bland</u> (2002) 28 Cal.4th 313 for the proposition that, where there are two assailants and it cannot be determined who shot the victim, there is insufficient evidence to sustain the enhancement for personally discharging the firearm and inflicting great bodily injury. (<u>Id.</u> at pp. 337-338.) But reference to Bland is unhelpful to defendant because, here, the evidence established that defendant shot Laster.

ECF No. 12 at 50-54 (Exhibit A).

The exhaustive analysis of the Court of Appeal, given the facts, speaks for itself in terms

24

of reasonableness.  There is not more for the undersigned to do but to find it AEDPA reasonable.

*Conclusion*

Accordingly, IT IS HEREBY RECOMMENDED that:

1.    The petition be denied in its entirety.

2.    A certificate of appealability should be issued only for the <u>Faretta</u> advisement issue (Ground 1), i.e, on "range of punishment."

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: January 7, 2019

<u>/s/ Gregory G. Hollows</u>
UNITED STATES MAGISTRATE JUDGE